UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| RITA K. SELF BARILE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NUMBER: 1:17 CV 271 |
| | ) |
| LUTHERAN HEALTH NETWORK OF | ) |
| INDIANA, LLC and ST. JOSEPH HEALTH | ) |
| SYSTEMS, LLC d/b/a ST. JOSEPH HOSPITAL | ) |
| | ) |
| Defendants. | ) |
| | ) |
| _____ | ) |

## OPINION AND ORDER

After the Defendants terminated Plaintiff, Rita K. Self Barile, ("Barile"), for alleged performance deficiencies, Barile filed the present ADEA action seeking damages for age discrimination and retaliation. Currently before the Court is the Defendants', Lutheran Health Network of Indiana, LLC ("LHN") and St. Joseph Health Systems, LLC ("St. Joe"), Motion for Summary Judgment [DE 31]. For the following reasons, the Motion will be GRANTED.

## APPLICABLE STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of designated evidence that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific

facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.' " *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255. Mindful of these standards, the Court turns now to the facts of the case.

## FACTUAL BACKGROUND

### A. **Briefing Procedure**

Before setting forth the facts, it is necessary to address what is missing from the Plaintiff's filings, and that is a concise statement of disputed facts supported by citations to the record for the Court to consider. Federal Rule of Civil Procedure 56(c)(1) requires as follows:

> **(1)** *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56. In line with the Federal Rule, N.D.Ind. L.R. 56.1 requires the party opposing a motion for summary judgment to "include a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary." (N.D.Ind. L.R. 56.1(b)(2)).

Here, the Plaintiff has filed a "Statement of Genuine Disputes" but does not identify with any record citations in that document the material facts it "contends are genuinely disputed so as to make a trial necessary." Instead, the Plaintiff appears to have submitted legal disputes/issues she believes exist without any supporting record citations as to what facts support her assertion that there is a factual dispute. District courts throughout the country have been plagued with briefing such as this which does nothing but complicate matters for the court and have made it clear that such deficiencies will not be tolerated:

> To be sure, perhaps one could parse any individual paragraph in isolation and pick out a pertinent fact. But for a party, in essence, to demand that the court do this .... subverts the very purpose of the Local Rule, which ... is to insure that judges need not sift through the record hunting for facts on a party's behalf, like a pig hunting for truffles. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991); *Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 711 (7th Cir. 2015). All the plaintiff's tactic did is make it more difficult for the court to rule in anyone's favor, let alone the plaintiff. *See Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006)("An advocate's job is to make it easy for the court to rule in his client's favor ...."). When the asserted fact is, "it was noon," a primer on how clocks work is not a concise or proper response.

*McCarty v. Menards*, 327 F.R.D. 177, 180 (N.D. Ill. 2018).

This Court does have the option to simply deem all of the defendant's factual assertions admitted. *See* Fed.R.Civ.P. 56(e)(2)*; Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004); *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809 (7th Cir. 2005). Indeed,

Courts are entitled to expect strict compliance with the Local Rule regarding summary judgment. *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015); *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 537 (7th Cir.2011); *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir.2010). However, in the argument section of the brief, the Plaintiff has made record citations and, for this reason only, the Court will sift through the record as best it can to determine whether genuine, material factual disputes exist. Mindful of this, the facts are as follows:

### B. <u>Facts</u>

Barile is currently 64 years old. At the time of her termination, she was 61 years old. At all relevant times in this action, Barile was a Licensed Mental Health Counselor and was considered an at-will employee. Likewise, at all relevant times, Rogher Hargus ("Hargus") was the Director of St. Joe Behavioral Health and Steve Haggen ("Haggen") was the Human Resources Director of St. Joe Behavioral Health.

In 2012, Barile worked with St. Joseph Behavioral Health[1] as a mental health counsel/therapist and continued in that position until her termination in August, 2016. While working at St. Joseph Behavioral Health, Barile worked in all three of its behavioral health programs: inpatient behavioral health, generations (elderly patients), and intensive outpatient therapy ("IOP"). (Deposition of Rita Self-Barile, DE 33-2, at 19, hereafter "Barile Dep. at ___"). Beginning in 2015, however, Barile worked exclusively in the IOP, first as co-facilitator of group therapy for patients with addictions, then as sole facilitator of that group. (Barile Dep. at 20). The IOP is staffed with two therapists that provide "intensive level outpatient services to clients that were stepping down from the inpatient unit or needed a higher level of care than traditional

---

[1] LHN owns St. Joe. St. Joseph Behavioral Health is likewise owned by LHN. However, St. Joseph Behavioral Health's administrative offices and treatment areas are located with the premises of St. Joseph Hospital. Barile's employer, however, was LHN.

outpatient therapy." (Deposition of Lyndsey White, DE 33-3, at 9, hereafter "White Dep. at ___"). In the IOP, Barile worked alongside a second therapist named Joretta Wilt ("Wilt"), until Wilt retired in April, 2016.[2]

When Barile first transferred to the IOP, Patrick Balke ("Balke") was her supervisor. (Barile Dep. at 21). In August, 2015, Lyndsey White ("White") joined the IOP at St. Joseph Behavioral Health, initially to create an intake assessment office. (*Id*. at 21-22). However, in January, 2016, she became manager of the IOP which, in turn, positioned her as Barile's supervisor.

White's tenure with St. Joseph Behavioral Health was short-lived; she ultimately left her job and relocated in December, 2016. That did not, however, occur soon enough, in the opinion of Barile as Barile and White can fairly be described from the record as having a rocky and confrontational relationship, all of which is detailed below.

A few months into her tenure, White learned she would be transitioning to the supervisory position. Balke and White had a conversation wherein Balke expressed concerns of performance related issues with Barile. (White Dep. at 25). According to White, Balke advised her that when he tried to discuss the issues with Barile, Barile "would become angry and aggressive towards him, and it made him fearful and uncomfortable." (*Id.*). Thus, he sought her assistance in providing feedback to Barile. (*Id.*). Shortly thereafter, Barile and White engaged in a verbal altercation with one another in the hallway over work-related issues. The accounts of this altercation could not be more diverse.

---

[2] Barile contends that Wilt was "forced out" of her position by White due to her age. However, when pressed for what evidence she had to support this assertion, Barile could not identify any scenarios or evidence to support her assertion.

Barile contends that she was frustrated that White was not providing help to her that she needed and her frustration boiled over into a verbal dispute. (Barile Dep. at 62: "I complained that she was giving help to Jeri but not to me. She was allowing Jeri to have assistance in her groups, but she wasn't providing assistance to me. And I was angry about that."). White, however, explained that there was "a situation where Rita was yelling at her clients in group and making some pretty derogatory kind of statements and [sic] red and shaking and really angry" and Balke asked White for advice on how to handle it. (White Dep. at 25). White then states she approached Barile in the hallway and attempted to have her go into her office to regain control of her emotions. (*Id.* at 26). However, White testified that Barile yelled at her and became aggressive. (*Id.*). Barile denies that she was loud, yelling, or aggressive.

Despite the differing versions of events, on October 6, 2015, Barile received a written warning. (Barile Dep. Exhibit A Written Warning dated 10/6/15). Hargus and White were both present when Barile received the warning. (White Dep. at 27). That warning indicated that Barile, "engaged in open discussion of private work related issues in front of other staff members and patients" and "engaged in verbally aggressive behavior." (*Id.*). In addition, Barile was referred to, but ultimately did not take advantage of, the employee assistance program, for help with her emotional responses. (Barile Dep. at 71). In her deposition, Barile acknowledged her fault in this verbal alteration and she testified that she "apologized because I know it was inappropriate." (Barile Dep. at 63). However, she testified that the written explanation from White in the write-up was exaggerated and she was not as angry as White made her out to be. (Barile Dep. at 66-69). This was Barile's first written warning during her employment with St. Joseph Behavioral Health.

Subsequently in April, 2016 and after White became Barile's supervisor, St. Joseph Behavioral Health was audited by the Joint Commission, an accrediting body for behavioral health

providers. (White Dep. at 34). During the audit, the Joint Commission reviewed charting for the IOP chemical dependency, which was Barile's group. (*Id.* at 35-37: "The Joint Commission auditor requested only charts from the chemical dependency program."). The IOP received several citations based on clinical assessments and four of the six findings of the Joint Commission were specifically related to the clinical documentation found in Barile's charts. (*Id.* at 36). Barile does not dispute these findings; instead, she contends that the Joint Commission found fault with the forms used by St. Joseph Behavioral Health, but not her specifically (Barile Dep. at 88). The Joint Commission noted deficits in the psychosocial assessment related to trauma assessment, suicide assessment, and those risk factors. (White Dep. at 38). Essentially, according to White, Barile's charts lacked information that a therapist should have known to put into clinical documentation and that should have been present under Joint Commission standards. (White Dep. at 99-100). In response, St. Joseph Behavioral Health was required to redo the psychosocial assessment form, removing the clinician's subjectivity from the previous narrative approach. The new forms required the clinician to check boxes to ensure all questions were asked, which reduced the reliance on clinician skill and knowledge of what questions to ask during the assessment. (White Dep. at 39, 41). [3] White also created a treatment plan and guide in response to Barile's substandard

---

[3] White explained the Joint Commission's assessment and their critique in this way:

> So the forms were created based off of what we are educated on as licensed providers. So as a licensed medical health counselor, licensed clinical social worker like myself and Rita, we're trained extensively in our educational programs and in our ongoing continuing education requirements for the Professional Licensing Agency to stay abreast of what information needs to be included in those assessments. I mean we're trained specifically to ask certain things.
> So when the question says, Please describe your trauma history, part of our education and our understanding is to know that that includes physical, sexual, verbal abuse, domestic violence. Those are all the domains that you look for in your assessment.
> So when we redid the forms, we took out that ability to assume that you would know to always ask those questions. We should as licensed professionals, but we wanted to make it so that we could pass 100 percent of all audits and have every question answered.

charting, and educated the staff on treatment planning.  (*Id.* at 42).  Barile agreed that White began reviewing everyone's psychosocial assessments and treatment plans for new patients, but did not know why White was doing so.  (Barile Dep. at 89).   Likewise, Barile admitted that St. Joseph Behavioral Health intake form was changed after the Joint Commission assessment in July, 2016. (Barile Dep. at 88-89).

During the week of May 18, 2016, one of Barile's patients in the IOP addictions group committed suicide. The patient had not been showing up for group but continued to be considered as a group member.  (Barile Dep. at 104).[4]  After the patient committed suicide, Barile discharged him from the group but did not tell White because she did not believe White would care.  (Barile Dep. at 99-107).  White eventually learned of the suicide and testified that Barile's failure to inform White of the suicide and the discharge of the patient created a "major issue" due to a requirement that St. Joseph Behavioral Health report the information to the State and the Joint Commission. (White Dep. at 51-52).  White then held formal training with the staff as well as updated the suicide assessment form.  White testified that the patient had several "significant risk factors that would be a red flag for any clinician," but stated that Barile at no time consulted White or the patient's psychiatrist.  (White Dep. at 68).

On June 28, 2016,[5] Barile received a second write up for three violations of therapist standards as it relates to intensive outpatient therapy for patients with chemical dependency. Specifically, Barile was written up for: (1) independently discharging three patients from the program without discussing discharges with White; (2) failing to obtain coverage for one of her

White Dep. at 46.
[4] Barile stated that she was concerned about the patient's addiction and believed he was too severe for her outpatient program.  (*Id.* at 104-107).  She communicated her concerns to the patient and recommended that he get inpatient treatment, but he did not do so.  (*Id.*).
[5] The write-up is dated June 28, 2016 but was not signed until July 13, 2016.

group sessions while on vacation; and (3) leaving before the end of a shift without approval and without completion of assigned work. (White Dep. at 48; Exh 2). As noted above, Barile admitted to discharging one patient without notifying White; however, she testified that she did routinely share her discharges with White so she believed that White fabricated this reason. (Barile Dep. at 110-111). Additionally, although Barile admitted that she was unable to get substitute coverage for one of her group sessions while on vacation, she states that she made an attempt to find coverage and notified White.[6] When Barile received the write-up, she testified that White "probably knew" she was upset. (Barile Dep. at 115). White testified that Barile had "significant difficulty" accepting feedback and would become highly agitated and angry. (White Dep. at 54-55). Barile wrote on the write-up that she felt she was being bullied and that she would "take this up to H.R. and Kenneth Jones [and] [sic] the Equal Opportunity Employment Commission." (White Dep. Exh. 2).

After this write-up Barile wrote what she termed a "ten-point" memo (which was undated) to Hargus, Heggen, and Kenneth Jones, CEO of St. Joseph. (Barile Dep. Exh I; Deposition of Stephen Heggen, DE 33-4, at 8, hereafter, "Heggen Dep. at ___"). In the memo, Barile stated that White was "a problem" in the office, was causing an environment "filled with fear of reprisals and intimidation," and that the office is routinely filled with "chaos, confusion, and again fear (*Id.*). Barile claimed that staff were being written up needlessly and White disrespected them. Barile further complained that changes were being made too frequently and that the staff had their "guard up." Barile reiterated that she personally felt bullied and abused and wrote that White "would like to replace me with a younger person like herself. All of the people she has hired are close to her

[6] White testified that she had to pull employees from other responsibilities to cover Barile's group but did not routinely do so because Barile had a volatile relationship with another therapist. White stated that tension between the two therapists spilled into the work environment and that there were several instances of the two therapists yelling at each other. (White Dep. at 50-58)

age and have small children.  But no one has been safe.  Everyone is afraid of being abused, humiliated and of losing their jobs."  (*Id*).

In response to this memo, Heggen met with Barile in the Human Resources office. (Heggen Dep. at 6).  Heggen testified that he went through the list with Barile and requested she substantiate or support her allegations.  (*Id.* at 8, 10).  Barile, however, did not provide him with any support for her allegations of unfair treatment due to age and had no witnesses to substantiate such treatment.  (Heggen Dep. at 6-9).  Barile's evidence of age discrimination was based solely on the write-ups, all of which in his opinion appeared to be based entirely on documented performance related deficiencies.  (*Id.* at 59-60).  After this meeting concluded, Heggen testified he met with White and Hargus to discuss Barile's concerns.  Hargus then undertook further investigation.

On July 28, 2016, Hargus drafted a memo titled "Response to Rita's Issues with Lyndsey White 7-28-16."  (Heggen Dep., Exh. 5).  Specifically, Hargus investigated three concerns: (1) that the office was tense and "on edge;" (2) staff are afraid of Lyndsey because she yells and is out for power and control; and (3) Lyndsey is emotionally and verbally abusive and yells at staff making them feel humiliated.  (*Id.*).  Hargus, after interviewing all of the intake and IOP team, determined that there was, in fact, an edge of tension in the office due to the issues between White and Barile, but that staff generally had no problems with White aside from her high expectations.  (*Id.*). Specifically, Hargus wrote:

> Most staff indicated no problems with Lyndsey.  There were some comments that indicated that she can be very demanding.  This comes across as having very high expectations.  One staff did express some fear and concern about taking things to her out of concern for how she might respond.  This, on a small scale, is similar to Rita's allegations that 'you can't answer her and she is not interested in solving the problem.' …

(*Id.*).  Hargus found no evidence of verbal abuse by White.  (*Id.*: "There was no evidence

of being verbally abused noted.").

Meanwhile as Hargus was conducting his investigation, matters continued to deteriorate

for Barile on the IOP floor.  In mid-July 2016, the spouse of one of Barile's patients had

complained to Hargus about Barile's conduct.  Barile acknowledges the complaint was made but

was unaware of the specifics of the complaint.  (Barile Dep. at 199).  Subsequently, Barile pulled

the patient aside during a group break to inquire why the patient's spouse had complained.  (White

Dep. Exh. 8 at 5-6; Barile Dep. at 139: "I just suggested to the patient that we set up a meeting;

he, his wife, and me, so that I could remedy whatever she was upset about.").  White  met with the

patient after the group and reported that the patient was tearful and felt "cornered" by Barile.  Barile

acknowledged that her discussion with the patient upset the patient.  (Barile Dep. at 140).

Thereafter, White personally observed Barile's group and noted that Barile discussed a

patient's insurance claim and discharge status in front of the other members of the group.  (White

Dep, Exh. 8 at p. 4).  Barile admitted that she discussed patients' insurance claims issues in front

of the group and further admitted to interrupting patients during group.  (Barile Dep. at 120-121).

After observing the group, White met with one of the patients in group.  That patient complained

to White that he/she received no benefit from therapy, Barile was dismissive, Barile had no control

or structure in the group setting, and that Barile's negative attitude would discourage him from

recommending others to the group.  (White Dep. Exh. 8, at p. 5).  Barile denies all of these

allegations as to what occurred in group sessions.  (Barile Dep. at 126-129).

Shortly after these complaints, Barile received a third and final written warning on July 26,

2016, for failure to comply with hospital policy and violations of confidentiality.   More

specifically, Barile failed to complete a new patient registration but permitted the patient to

participate in group sessions. The record reflects that there may have been some confusion as to whether a new patient registration was actually required for this patient. Barile testified as follows:

> …I think I know of the patient that you're talking about, and she only attended one group session without HIPAA consents and that was because we didn't know if she was registered or not. She claimed – she was what we call a step down. She came from the inpatient unit down to the IOP unit. And when they step down, they don't need to have all the paperwork done because it's already been done. So [the patient] claimed she was not discharged. And we didn't know. She was very upset that someone …told her she was discharged. She would have to come in for an intake, and she got very upset because she did not know she had been discharged. And, in essence she had not been discharged. So I didn't know anything about it when she came into group…I was honest with her. I said, I don't know if you've been discharged. I said I can look into it later, but we had to start group. I couldn't do it at that time.

(Barile Dep. at 136-137).

Despite Barile's explanation, White had noticed that the registration had not been completed on July 1 and directed Barile to complete the registration. (Barile Dep. at 147). However, White contends that registration was not completed and the patient had not signed consents, including HIPAA consents, required for program participation as of July 16, 2016. As a result of the failure to register the patient, St. Joseph Behavioral Health was unable to bill for the services it rendered. Barile admitted that the required consents had not been obtained prior to the initial group session, but disputes that the consents were not completed by July 16, the date White asserts she learned consents weren't signed. (*Id.* at 135). White testified that the consents require patients to maintain confidentiality of group discussions and are designed to create a safe therapeutic environment. Barile acknowledged that getting HIPAA consents from patients prior to the start of the program was "critically important" and failing to do so is a violation of federal law. (Barile Dep. at 135).

In addition to these issues, on July 26, 2016, another of Barile's patients unsuccessfully attempted suicide. (Barile Dep. at 153). White reviewed the patient's chart and determined that

Barile's suicide assessment was not done consistently with how White had trained Barile after the first patient's suicide two months earlier. (White Dep. at 68-69). An investigation into the charting by White and Hargus revealed that the patient's documentation completed by Barile was at odds with the assessment; the scores on the chart were lower than the documented issues suggested. Had the documentation and scoring been in line with the assessment, the patient would have been placed in a high risk category and received a higher level of care. (Heggen Dep. at 55). However, Barile allowed the patient to leave St. Joseph Behavioral Health's premises. (*Id.*). White testified that the two incidents, a suicide attempt and a completed suicide, within two months of each other warranted an investigation into Barile's clinical practice. (White Dep. at 70).

On July 27, 2016, Barile was placed on investigative suspension due to substandard clinical assessment and documentation. (Barile Dep. Exh. G). White was not present for the July 27, 2016 disciplinary meeting that included Heggen, Hargus, and White. As part of the investigation into Barile's work, behavioral consulting experts reviewed Barile's charts and that three individuals, aside from White herself, recommended that Barile be terminated. (White Dep. at 73-74). White then made the final decision to terminate Barile, which she did on August 25, 2016, effective the next day. The conclusion of the investigation was that her work was substandard. (Barile Dep. Exh. H). Barile admitted that no one at LHN or St. Joseph Behavioral Health indicated her termination was age-based.

On July 28, 2016, after her suspension but prior to her termination, Barile filed her Charge of Discrimination. On August 1, 2016, again prior to her termination, Barile sent a memo to Jones, Heggen, and White alleging that White had targeted her through write-ups and a suspension for "manufactured reasons" and "simple errors." She further alleged that White used these write-ups

13

to eliminate her based on her age and that the write-ups became more frequent after she complained to Hargus, Heggen, and Jones.

Heggen met with Barile on August 9, 2016, as part of his investigation into her August 1, 2016 complaint. Barile did not provide any incidents or witnesses to the alleged discrimination. (Heggen Dep. Exh. 3 "Investigative Interview Checklist, HR Form 25"). Heggen took detailed notes of this meeting, noting that Barile was "very calm and subdued" but could not provide any witnesses or verification of the allegations she had made in her letter. Barile did provide examples of White's behavior that she found troublesome. One example was that White had allegedly told Barile to work more hours. The second example was the confusion over group coverage in June, 2016 which was included in the second write-up she received. Other than these examples, Heggen did not uncover any evidence that age motivated White's decision to discharge Barile. Thereafter, Barile filed the present suit alleging discrimination and retaliation in violation of the ADEA.

### C. **Declarations of Wilt**

As set out above, Barile worked with Wilt in the IOP until Wilt retired on April 1, 2016. Wilt has submitted a Declaration wherein she avers that prior to White becoming her supervisor, she had never been disciplined in the 22 years that she was employed with St. Joe. (Declaration of Joretta Wilt, DE 39-1, at ¶10, hereafter "Wilt Dec. at ¶___"). Wilt avers that she was disciplined with two write-ups and a number of verbal warnings after White became her supervisor. (Wilt Dec. at ¶11). One of these disciplinary events related to substandard care plan charting. (*Id.*). Wilt contends that after she changed her charting to reflect what White had requested, White was pleased; however, Wilt believed that the differences were in the charting were insignificant. (*Id.*). She avers that White "ignored" her and Barile in favor of the younger staff. She also avers that

White's reasons for discipling her were "silly and inconsequential." (*Id.*). Thus, she states that she would not have retired but for White's treatment of her. (*Id.* at ¶19)

In her second declaration, Wilt takes issue with specific decisions White made regarding her patients. For instance, Wilt asserts that she treated a dual diagnosis patient (i.e., a patient with both substance abuse and mental health diagnoses) and the patient expressed a desire to remain in the IOP psychiatric unit under Wilt's supervision. (Second Declaration of Wilt, DE 39-2, at ¶3, hereafter, "Wilt 2nd Dec. at ¶__"). Wilt states that White refused and transferred the patient into Barile's group and the patient later relapsed. (*Id.* at ¶3). Wilt then states that there were two additional instances where White discharged patients from the IOP psychiatric unit against Wilt's wishes and transferred them to Barile's group. (*Id.* at ¶4). Finally, Wilt avers that she personally observed, treated, and had knowledge of multiple suicide attempts by patients in the IOP and, while unfortunate, these were common occurrences even with adequate treatment and clinical assessments. (*Id.* at 6).

D. **Deposition of Kari Jefferis ("Jefferis")**

Jefferis is currently the Community Liaison for St. Joe Behavioral Health. (Deposition of Jefferis, DE 39-5, at 2, hereafter "Jefferis Dep. at ¶__"). Jefferis knows Wilt, Barile, and White through her employment at St. Joe Behavioral Health. (*Id.* at 3-5). Jefferis testified that at some point after Wilt retired, she met Wilt and Barile for dinner at a local Fort Wayne restaurant, Hoppy Gnome. (*Id.* at 5-6).

The three women engaged in a discussion that included a conversation about White, and Wilt and Barile's displeasure with her. (Jefferis Dep. at 7-8). Jefferis does not recall either Wilt or Barile complaining that White targeted them based on age. (*Id.* at 8: "I remember both of them being unhappy with her management style, but I don't remember a conversation where age came

up."). During this conversation, Jefferis recalls telling Wilt and Barile that she overheard White comment that the two women were the highest paid employees in the department. (*Id.* at 12). Specifically, Jefferis testified:

> A: Um, I believe it was in or before a morning meeting that we had. Um, I don't believe Lyndsey was talking directly to me, it was to someone else who I can't remember. Uh, but I, from what I remember, the discussion was we could hire more intake staff, but I have three people that have high salaries that are, um, you know, making it impossible for me, Lyndsey, to um, do more hiring. That's what I remember.
> …
> Q: Can you give me some context on the statement from Lyndsey White, how did she come to make that statement, do you recall?
> A: Well, I, like I said, I think it was, you know, it maybe an evening before had been really busy and understaffed, and it was kind of off the cuff, like, oh I could hire more evening stuff if I didn't have these high salaries.
> Q: And when she said "was she referring to Rita and …
> A: Pat.
> Q: Pat? Okay. Cause Jeri had already gone?
> …
> A: I'm not sure.

(*Id.* at 12-13). Jefferis cannot recall an exact time or day that she overheard this statement but she thinks it was relatively close to the time she saw Wilt and Barile for dinner. (*Id.*). White denied in her deposition that she ever made such a statement. (White Dep. at 96-97).

### E. White's Supplemental Affidavit

In response to Wilt's affidavit, White filed a supplemental affidavit intended to contradict Wilt's Affidavits and Jeffries Deposition testimony. (Second Declaration of White, DE 45-1, hereafter "White 2nd Dec. at ¶___"). For instance, in her supplemental affidavit, White avers that the IOP budget was based on a staffing grid. (White 2nd Dec. at ¶3). Under that grid, White states that she was advised how many full-time equivalents of each position she was permitted to have under the budget. (*Id.*). She further stated that in her position she "did not have the ability to save program money or free up money for other positions by firing higher paid, or older employees and

replacing them with lower paid or younger employees." (*Id.*). Finally, she testified that during her time at LHN, she was limited to interviewing and hiring individuals who had applied for open positions through talent acquisition software, Taleo. (*Id.* at ¶4). She acknowledges hiring five individuals for the intake department, all of whom were in their twenties or thirties. (*Id.*) However, she indicates that she did not receive any applications through Taleo from individuals older than 40. (*Id.*).

## DISCUSSION

The ADEA protects workers 40 years of age and older from age-based employment discrimination. As relevant here, the Act makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual [in the protected class] ... because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on an age-discrimination claim, the plaintiff must prove that his age was the "but-for" cause of the challenged job action. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009). In other words, under the ADEA "it's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred." *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009). "In this respect, the ADEA is narrower than Title VII ... [because] Title VII protects against mixed-motive discrimination." *Carson v. Lake County*, 865 F.3d 526, 532 (7th Cir. 2017).

Barile may carry her burden by presenting direct or circumstantial evidence that the Defendants took the challenged job action against her because of her age. *Id.* at 532–33. Alternatively, she may proceed under the *McDonnell Douglas* burden-shifting approach by producing evidence that a similarly situated person not in the protected class was treated more favorably. *Id.* at 533 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ). If she does so, the burden shifts to the Defendants to articulate a legitimate,

nondiscriminatory reason for the challenged action. *Id.* Under this alternative method of proof, Barile then has the burden to show that the stated reason was a pretext for discrimination. *Id.* Regardless of how Barile chooses to proceed, the basic question at the summary-judgment stage is whether the evidence as a whole would allow a reasonable jury to find that she suffered an adverse job action because of her age. *Id.*; *see also Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Here, Barile asserts that she has direct and/or circumstantial evidence that by itself raises an inference that White fired her due to her age. With respect to direct evidence, Barile cites the testimony of Jefferis where she claims she overheard White say that she could not hire additional staff because of the high salaries being paid to Barile and Pat Balke. Barile asserts that this is a direct acknowledgment by the decision-maker and clear evidence that she was targeted for discharge due to her age which, in turn, raises an inference of age discrimination.

Unfortunately for Barile, even giving Barile the benefit of the factual dispute as to whether White ever made such a statement, the problem for Barile is that "[a]n employment decision based on compensation level ... does not violate the ADEA." *Knowles v. United Healthcare Servs., Inc.,* No. 05 C 1613, 2006 WL 1430212, at *9 (N.D.Ill. May 19, 2006) (citing *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1126 (7th Cir.1994)); see also *Cole v. Illinois Tool Works, Inc.*, 924 F. Supp. 2d 978, 990 (N.D. Ill. 2013). Indeed, the Supreme Court has stated that "[b]ecause age and ... [compensation levels] are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on ... compensation level is necessarily 'age based.' " *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 611 (1993). Thus, this evidence alone is insufficient to raise a genuine issue of fact that her termination was age-based.

Next, Barile contends that she has met her burden under the *McDonnell Douglas* framework. Under this framework, the plaintiff must come forward with evidence showing that "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). Defendants concede that two of the four prongs above are met. Barile was 61 years old at the time of her discharge and she was, in fact, discharged.

With respect to whether Barile was meeting the legitimate expectations of her employment, Barile asserts that a genuine issue of material fact exists on this issue. For instance, she disputes that her work performance was deficient and contends that there was no basis in fact for the progressive discipline she received. She specifically points to the alleged deficiencies in her charting found by the Joint Commission and contends that she was never informed of such deficiencies.

In response, the Defendants point out that Barile admitted some of the conduct for which she received discipline. For example, she acknowledged that her conduct documented in the first write-up on October 6, 2015 was inappropriate and she apologized for it. While there is an underlying dispute as to what precipitated the interaction Barile and White had, Barile was ultimately disciplined for the unprofessional interaction she had with White, which Barile admitted. Similarly, the Defendants point out Barile admitted that she discharged at least one patient without White's knowledge; admits that she attempted to get coverage for two shifts but only received coverage for one; and admits that she left work early to attend an event and had to return to the office later to finish assigned work.

What is clear in the record before the Court is that White and Barile certainly had workplace issues which had them at odds with one another on numerous occasions. While Barile offers conflicting accounts for some of the workplace issues from the explanations offered from White that she translated into performance related deficiencies, the record from which a jury could conclude that Barile was meeting the legitimate expectations of her employer is thin and based mostly on her own subjective opinion that she was performing adequately. That said, even if the Court concludes that a genuine issue of material fact exists as to whether the discipline that Barile received had a basis in fact, Barile ultimately fails on several other issues.

For instance, Barile has absolutely no evidence to support the fourth prong of the McDonnell Douglas formulation, i.e., that similarly situated employees that were younger received more favorable treatment than Barile. Barile was the only employee White terminated during her tenure and despite Barile's testimony that she was being targeted unfairly and written up for senseless violations, Barile cannot point to any similarly situated younger employee that was engaged in the same conduct and treated more favorably. Indeed, even Wilt's Declaration supports the assertion that White disciplined her for issues similar to Barile's, despite Wilt believing they were silly reasons. Moreover, Barile's complaints to Heggen, Hargus, and Jones indicated her belief that White was treating everyone the same -- "no one has been safe," "everyone is afraid of being abused, humiliated and of losing their jobs." (Barile Dep. Exh. I). Thus, the inference from Barile's own evidence is that White "had it in" for all employees and had high expectations for employees that she enforced uniformly.

This said, even assuming the Court gives Barile the benefit of the doubt, the Defendants have pointed to her performance deficiencies as the legitimate reason for her discharge. At this point, Barile must produce evidence from which a reasonable jury could not only conclude that

the explanation given was false but that the true reason for the challenged action is Barile's age. See *Ortiz, 834 F.3d at 765* ("Th[e] legal standard ... is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action. Evidence must be considered as a whole...."). This, she has not done.

There is simply no evidence from which a jury could find that the Defendants' discharge decision was age based as opposed to some other reason. Barile attempts to establish age as the factor with the Declarations of Wilt wherein Wilt avers that it is her "belief" that she was targeted for discipline for "silly" and "inconsequential" matters due to her age. However, neither she nor Barile have pointed to any evidence other than their own conclusory opinions to believe this. Conclusory assertions about a decision maker's motivations are insufficient to establish pretext. *Oest v. Illinois Dept. of Corr.*, 240 F.3d 605, 614 (7th Cir.2001); *Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1032–33 (7th Cir.1998); see also, *Torrech-Hernandez v. Gen. Elec. Co.*, 519 F.3d 41, 53–54 (1st Cir. 2008) ("[P]ersonal opinion, unsupported by fact, is not sufficiently probative on the issue of pretext.")

Barile also attempts to establish pretext by asserting that all five individuals that White hired during her tenure were in their 20s and 30s. White does not dispute this; however, she also provides a reasonable explanation for this, i.e. no applicants over 40 applied for the positions. Barile has not challenged this explanation with any facts to dispute White's assertion.

In sum, Barile has not carried her burden of showing that her performance deficiencies and subsequent discharge were manufactured by White as a pretext for age discrimination. Rather, the evidence raises an inference that this is a classic case where a new supervisor takes over the workplace and has expectations that differ from a prior supervisor. Barile admits that she preferred Balke's way of supervising over White's and did not feel White was competent to run the IOP.

Indeed, she outlined her opinions in her ten-point memo. Moreover, from the get-go Barile admits she engaged in inappropriate conduct with White. However, at the end of the day, White's actions were all within the realm of her managerial discretion and Barile has not presented any evidence from which a jury would conclude that age played any role in the discharge. This Court is not here to second guess managerial decisions. *See Traylor v. Brown,* 295 F.3d 783, 790 (7th Cir.2002) ("[W]e do not sit as a super-personnel department over employers scrutinizing and second-guessing every decision they make[ .]"); *Cardoso v. Robert Bosch Corp.,* 427 F.3d 429, 435-36 (7th Cir.2005). This is particularly true in cases like this, where Barile has offered no evidence that Defendants' reasons are pretextual. Accordingly, the Defendants' Motion for Summary Judgment is GRANTED.

Barile's retaliation claim fares no better. To survive summary judgment Barile needed evidence that would permit a reasonable factfinder to conclude that her engagement in protected activity caused a materially adverse employment action. *See Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465, 472 (7th Cir. 2018); *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017). An employee engages in a statutorily protected activity by either: (1) filing a charge, testifying, assisting, or participating in any manner in investigation, proceeding, or hearing under Title VII; or (2) opposing an unlawful employment practice. *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013). "Vague and obscure 'complaints' do not constitute protected activity." *Id.* (citing *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850–51 (7th Cir. 2008)).

Here, Barile asserts that her ten-point memorandum constitutes the beginning of her statutorily protected activity. Specifically, she contends this memo outlined all the instances and complaints she had about White and the fact that she felt bullied and harassed by her. Indeed, Barile's memo contains a host of complaints about White including that she is too inexperienced

to run the IOP, she creates a fearful and chaotic work environment, she makes changes too frequently, and various other complaints about White. What is lacking from the ten point memo is any allegation that Barile is the victim of unlawful discrimination due to age rather than general unfairness. Barile points to the fact that she wrote "I am kind, gentle, caring, and honest. I also think she would like to replace me with a younger person like herself. All of the people she has hired are close to her age and have small children. But no one has been safe. Everyone is afraid of being abused, humiliated and of losing their jobs" as evidence that she was complaining of age discrimination. However, "general 'complaints to management' do not constitute protected activity when the plaintiff does not 'object[ ] to discriminatory conduct against her based on her membership in a protected class.' *Jenkins v. Regents of the Univ. of Mich. Health Sys.*, 763 F. App'x 545, 552 (6th Cir. 2019) (first alteration in original) (quoting *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 511 (6th Cir. 2016)); *see also Mumm v. Charter Twp. of Superior*, 727 F. App'x 110, 112 (6th Cir. 2018) ("[A] complaint must allege unlawful discrimination rather than general unfairness."). Indeed, Barile's broad-based allegation that White wanted to hire younger individual, that no one is safe and everyone is afraid simply does not constitute protected activity.

What clearly does constitute protected activity is Barile's EEOC charge of discrimination filed on July 28, 2016 as well as her written statement to Jones, Heggen, and White on August 1, 2016 wherein she states that her write-ups and performance deficiencies were manufactured and she feels that "these are being used to eliminate me based on my age…" [DE 39-3]. Unfortunately for Barile, however, both of these instances of protected activity occurred after Barile was placed on administrative suspension for performance related deficiencies. For this reason, Barile is unable to demonstrate a causal connection between her protected activity and the administrative suspension which led to the decision to terminate her employment. Moreover, she has produced

no evidence that the protected activity was the cause of her discharge rather than the series of documented performance deficiencies. Accordingly, summary judgment is GRANTED as to Barile's retaliation claim.

## **CONCLUSION**

Based on the foregoing, the Defendants' Motion for Summary Judgment [DE 31] is GRANTED. The Clerk is directed to enter judgment in favor of the Defendants.

Entered: September 16, 2019

s/ William C. Lee
United States District Court